UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.

AMESBURY PUBLIC SCHOOLS,
        Plaintiff

v.

BUREAU OF SPECIAL EDUCATION
APPEALS of the MASSACHUSETTS DIVISION
OF ADMINISTRATIVE LAW APPEALS, and
JOHN DOE AND JANE DOE,

        Defendants

**COMPLAINT FOR JUDICIAL REVIEW OF
<u>FINAL DECISION OF STATE ADMINISTRATIVE AGENCY</u>**

<u>**Introduction**</u>

1.      This is a complaint for judicial review of a final Decision and Order rendered by

the Defendant, Bureau of Special Education Appeals of the Massachusetts Division of

Administrative Law Appeals ("BSEA").

2.      In this Decision, the BSEA Hearing Officer found that the Defendants, John Doe

and Jane Doe (hereinafter referred to as "Parents"), met their burden to prove that the educational

program proposed by the Plaintiff, Amesbury Public Schools, for their daughter for the period of

May 21, 2020 to May 20, 2021 was not reasonably calculated to provide her with a free

appropriate public education solely because - during the period of state-wide COVID-19

educational mandates and restrictions that caused unpredictable interruptions in student in-person

learning throughout the school year - Amesbury failed to provide her with "opportunities to form

meaningful connections with peers." As a result, the Hearing Officer ordered the Plaintiff to

1

reimburse the Parents for tuition and costs associated with the Student's unilateral placement in a private educational program.

3.      Otherwise, the Hearing Officer found that the services, curriculum, and methodology offered through the Plaintiff's educational program were appropriate and that the student would have benefited from the academic, pre-vocational and social skills instruction which would have been provided in the proposed program.

4.      The Hearing Officer also found that the private educational program for which she ordered reimbursement had significant limitations that "falls short of offering [the student] an education that meets all of her needs" and which "may not provide [the student] with a [free appropriate public education] in the [least restrictive environment]."

5.      Because, under the applicable laws and regulations, the Plaintiff could not have proposed the student's placement in a program with such fundamental deficiencies, the Plaintiff is aggrieved by the Decision and seeks relief on that and the following additional grounds:

a.      the Decision is based upon erroneous conclusions and findings of fact which are not supported by the evidence and constitutes an abuse of discretion;

b.      the Decision is based upon erroneous conclusions of law; and

c.      the Hearing Officer misapplied and relieved the Defendant Parents of their burden of proof to establish their claims by a preponderance of the evidence.

### Parties

6.      The Plaintiff, Amesbury Public Schools, acting by and through its School Committee, is a body politic and corporate as established under the laws of the Commonwealth of Massachusetts, with a usual place of business located at 5 Highland Street, Amesbury, Massachusetts 01913 (hereinafter referred to as "Amesbury" or the "District").

7.     Defendant, Bureau of Special Education Appeals of the Massachusetts Division of Administrative Law Appeals (hereinafter "BSEA"), has a usual place of business at 14 Summer Street, 4th Floor, Malden, Massachusetts 02148. The BSEA was created by the Massachusetts Department of Elementary and Secondary Education and has the authority to resolve educational disputes under federal law in accordance with 20 U.S.C. 1401 *et seq*. and the regulations promulgated thereunder, 34 C.F.R. Part 300 and 34 C.F.R. Part 104 respectively, and under Massachusetts state law pursuant to M.G.L. c. 71B and its implementing regulations, 603 CMR 28.00.

8.     Defendant, John Doe, is an individual who resides in Amesbury, Massachusetts, and is the father of the student who is the subject of the Decision being appealed, hereinafter identified as "Uma". [1]

9.     Defendant, Jane Doe, is an individual who resides in Amesbury, Massachusetts, and is the mother of Uma.

## Jurisdiction and Venue

10.    This court has jurisdiction of this complaint pursuant to 20 U.S.C. §1415(i)(2) and (3), the Individuals with Disabilities Education Act (IDEA).  Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## Facts

11.    Uma is a fifteen-year-old eighth grade girl who is eligible to receive special education services under an Individualized Education Program (hereinafter "IEP") through the

---

[1] "Uma" is a pseudonym selected and used by the Hearing Officer in her Decision to protect the privacy of the minor student. Accordingly, the Plaintiff will proceed in this appeal using the same pseudonym.

Amesbury Public Schools under the categories of an intellectual disability and a communication disability.

12.     Uma attended the Amesbury Public Schools from preschool through the end of seventh grade. In elementary school, Uma made progress and functioned well overall with the support of a one-to-one aide in the inclusion setting and pullout for math and English Language Arts. (Decision p. 4, ¶3).

13.     Uma transitioned to Amesbury Middle School in fifth grade. In fifth and sixth grade, she was in a partial inclusion program with special education support. She attended science, social studies, and electives in the inclusion setting with a one-to-one aide. At times she struggled with the modified general education curriculum because it was either too challenging or too simple. (Decision at 4, ¶4). She received ELA and math instruction in the Learning Center in a small group with other students; those students had similar interests, required similar interventions and were supportive of each other. (Decision at 5, ¶8). Uma did well in her Learning Center classes but her assignments were modified significantly. (Decision at 5, ¶7). Uma enjoyed school and felt she was a member of the school community.

14.     At the start of 6th grade school year, Uma's mother approached Dr. Lynn Catarius, Amesbury's newly appointed Director of Student Services, and expressed concerns about the special education programs at Amesbury Middle School, including concerns about Uma's programming.

15.     As a result of this conversation, on October 4, 2018, Dr. Catarius shadowed Uma for an entire school day to see what her educational program was like and "improve upon the current programming" at the middle school. (Transcript Vol. 1 p. 88, and Vol. 3, p. 193-195).

16.     The results of that observation, which the Hearing Officer found "served as the impetus for the creation of the Life Skills Program," prompted Dr. Catarius to pull together a team of professionals to create a program in the middle school. The Program would have the overarching goals of functional academics, pre-vocational experiences, and generalized development of social skills. (Decision at 7, ¶13). It was designed to provide students with a space to build academic and social skills and to begin generalizing these skills across settings in which they could have opportunities to succeed, including inclusion classes with non-disabled peers. (Decision at 7, ¶14).

17.     The group of professionals worked together to select the students for whom they would propose the new program. (Decision at 7, ¶13). They discussed potential students, reviewed IEPs, evaluations, and other information, and carefully selected a group of six students they believed would be an appropriate fit for the Life Skills Program based on their profile. (Transcript Vol. 2, 286-287). The Program was designed to be a self-contained placement for students with intellectual disabilities who required opportunities to develop functional academics and life skills, with the ultimate objective of transitioning into the high school Life Skills Program and then into adulthood within the community. (Decision at 7, ¶14).

18.     Uma was one of the six students who was selected for the Program. Based on the team's vision for Uma and her long-term goals, the team believed the Life Skills Program "would be more beneficial for her to be really focusing on those skills that she'll need." In the program, Uma would continue to receive rigorous academics but the "academic skills would have been more useful for her, because they would have been addressing the skills that she was struggling with and that then would be useful for her going forward." The Life Skills Program would give her the opportunity to be with peers who had "similar learning styles" and

"participate in instruction that was more tailored to her specific needs [which] would be really valuable, and also the fact that… there would be a connection between what she was learning and functional real-life situations, which is her area of strength." (Transcript Vol. 3, p. 51-53). She would also continue to have inclusion opportunities with non-disabled peers "in subjects that Uma is interested and passionate about" and also in classes where she was "an equal" to non-disabled peers so they would see her as "competent" and she would see herself as competent. The team believed that this was an important part of Uma's education, especially since "these are the types of interactions that she's going to have in the future in the community, with her neighbors, people that she works with." She would have the opportunity to "generalize and develop those skills in those classes." (Transcript Vol. 3, p. 62-63).

19.     The Life Skills Program opened on January 29, 2019. Uma's Parents rejected the proposal for the Life Skills Program for the remainder of sixth grade. They were concerned about the structure and content of the Life Skills Program, which they believed would interfere with Uma's ability to function as a full member of her community. (Decision at 7, ¶14). Uma's mother did not like the idea of a self-contained classroom, and Parents believed Uma's functioning in life skills was adequate and that she should be focusing on academics. (Decision at 8, ¶14). Parents instead asked that Uma remain in inclusion science and social studies with the support of an aide and in a small group for ELA and math. (Decision at 8, ¶15).

20.     Uma's mother observed the Life Skills Program in March of 2019, less than two months after the program started. That was the only observation that Parents ever did of the Life Skills Program.  (Decision at 8, ¶ 15; Transcript Vol. 1, p. 103).

21.     The group of students who were previously in the Learning Center with Uma moved into the Life Skills Program when it started, causing the remaining peer cohort in her

special education classes to change. (Decision at 7, ¶13). For the remainder of sixth grade, Uma experienced difficulty in her classes, she struggled to keep up, and she frequently felt like she was behind. She told staff that she was overwhelmed, lost, and frustrated. (Decision at 8, ¶16). Amesbury's staff believed that Uma would continue to grow in the Life Skills Program if she were placed with students with whom she had previously been serviced, but Parents rejected the Program. (Decision at 7, ¶14).

22.    On June 5, 2019, the team reconvened to review an independent neuropsychological evaluation completed by Dr. Kay Seligsohn, PhD.

23.    Dr. Seligsohn concluded that Uma should continue to engage with academic learning in a rigorous manner and that her goals should include functional academics, particularly functional literacy and basic mathematics skills. She found that Uma "does require a school program that provides intensive life skills training alongside appropriate academic skills" in a substantially separate classroom for children with Mild Intellectual Disabilities" but that "primary placement in a Life Skills Program would not be appropriate." (Decision at 9, ¶19).

24.    Dr. Seligsohn did not observe the Life Skills Program nor did she speak with District staff to get their input regarding the Life Skills Program. She also did not participate in the Team meeting to discuss her findings with the Team.

25.    At the team meeting, the District proposed placement in the Life Skills Program and the Parents rejected it, stating the Life Skills Program was too restrictive and expressing their desire for Uma to continue receiving academic instruction in the general education setting. (Decision at 10, ¶21 and ¶23).

26.    Uma participated in Extended School Year Services in the Life Skills Program during the Summer of 2019. Uma responded well to the curriculum, which is the same

7

curriculum that is used in the Life Skills Program year-round, and she responded well to the peer cohort in the Life Skills Program. (Decision at 11, ¶25).

27.     On November 15, 2019, when Uma was in seventh grade, Uma's team met and again proposed the Life Skills Program.

28.     The Parents continued to reject the Program, expressing their desire to maintain her placement in an inclusion program that they believed would allow her to grow socially. (Decision at 11, ¶26).

29.     Uma remained in the partial inclusion program during seventh grade but struggled academically and socially. She could not keep up with the academic work and required one-to-one assistance from a teacher or paraprofessional because she needed so much help. This isolated her from the peers in her classes, and she had difficulty connecting with the peers in her small groups. (Decision at 11, ¶27).

30.     However, Uma displayed strengths in her elective classes with non-disabled peers. "She was able to navigate the school independently between classes and run errands for teachers. She attended several electives independently, including chorus, art, and physical education. She enjoyed participating in these classes, which were a highlight of her day." (Decision at 12, ¶28).

31.     During the Summer of 2020, following the start of the COVID-19 pandemic, Parents placed Uma at Merrimac Heights Academy (hereinafter "MHA"), a private special education school located in Merrimac, Massachusetts, because it would be offering in-person instruction. Parents did not request that the District fund the summer program at MHA prior to placing her.[2] (Decision at 13, ¶32).

---

[2] The Decision found Parents were not entitled to reimbursement for their placement of Uma at MHA for the summer of 2020. (Decision at 36).

32.    Subsequently, the Parents asked the District to participate in mediation in August 2020 to discuss placement for the 2020-21 school year. The District was planning a remote start to the school year because of COVID and agreed to mediation. As a result of the mediation, an agreement was reached for Uma to participate in an extended evaluation at MHA for the start of the 2020-21 school year. (Transcript Vol. 3, p. 211, Vol. 1, p. 105).

33.    The Parents hired Dr. Rebecca Tubbs to observe Uma at MHA and to conduct an independent neuropsychological evaluation after she started at MHA. Dr. Tubbs observed Uma on two days, once during the summer and a second limited observation during the school year. Dr. Tubbs did not contact anyone from the District for input about Uma, nor did she conduct an observation of the Life Skills Program (or any other program) in the District. (Decision at 16, ¶42 and 18, ¶45).

34.    The Team met to review the Tubbs evaluation on October 29, 2020. Dr. Tubbs did not participate in the Team meeting, and there was nothing in her report that stated the Life Skills Program was not appropriate for Uma. The team concluded that all of Dr. Tubbs's recommendations were satisfied by the services included within the Life Skills program.

35.    As a result, the Team continued to propose that Uma return to the Life Skills Program, stating that it was "sufficiently rigorous; based on individualized, tiered structured, cohesive curricula that, among other things, facilitates independence, critical thinking, problem-solving, and self-advocacy skills in a language-rich environment; and comprised of like peers who are socially engaged and motivated to learn." (Decision at 21, ¶51).

36.    The team updated the IEP dated May 21, 2020 to May 20, 2021 to incorporate results and recommendations from Dr. Tubbs' evaluation.

37.     Ultimately, in her Decision, the Hearing Officer found that the Life Skills Program "provides targeted academic instruction at each student's skill level that is connected to real-life tasks and experiences; constant instruction in social skills, both direct and in the moment, as well as functional adaptive and vocational skills; and integrated opportunities." (Decision at 23, ¶53).

38.     The Life Skills program is staffed by a special education teacher and three paraprofessionals, one is attached to the program and the other two are assigned to particular students.

39.     The following additional individuals are attached to the program and provide consultation and direct services to students: occupational therapist, physical therapist, speech language pathologist, BCBA, vision/mobility specialist, Assistive Technology specialist, and an augmentative communication specialist. (Decision at 23, ¶53).

40.     Students in the Life Skills Program have inclusion opportunities for elective classes, field trips and clubs, and reverse inclusion opportunities. The Life Skills Program incorporates social activities such as a Super Bowl party, a school election, and prevocational activities such as a cookie cart, copying jobs, recycling, and delivering supplies and meals. There are also community programs such as assembling holiday baskets, food drives, and mailings. (Decision at 23, ¶53).

41.     Uma's team continued to believe that the Life Skills program was appropriate because it provided an academic curriculum and instructional methodology that was consistent with Uma's needs; that it incorporated adaptive and pre-vocational skill training into the curriculum; that it provided appropriate social skills training; that it provided a suitable peer group and access to inclusion opportunities as appropriate; that it had the ability to individualize

educational opportunities for each student; and that it provided highly competent and well-trained staff equipped to provided services to a student with Uma's needs.

42.     Without observing the Life Skills program or allowing Uma to try it, the Parents subsequently rejected the placement on November 3, 2020 and unilaterally placed Uma at MHA. At the time of Uma's placement at MHA, there were only seven students in that school, four of whom were between the ages of 18 and 21 years old and were participating in MHA's post-high school studies.

43.     On November 19, 2020, the Parents filed for a due process hearing at the BSEA seeking reimbursement for costs associated with Uma's unilateral placement at MHA.

44.     In the Hearing Request, the Parents' argued that the Life Skills Program was not appropriate because it offered functional academics and focused on life skills, whereas, instead, the Parents asserted that Uma needed a program designed to teach academics to students with mild intellectual disabilities.

45.     As the basis for the Hearing Request, the Parents asserted the following:

a.   Evidence at Hearing . . . will show that Uma's potential to make academic progress is excellent, as long as she is in a program that is designed to teach academics to students with mild intellectual disabilities.

b.   Evidence at Hearing . . . will show that APS cannot provide Uma with a FAPE that will prepare her for further education, employment or independent living.

c.   Evidence at Hearing will show that this program is inappropriate for Uma, and constitutes a denial of FAPE to her. Aspects of the IEP and placement that Uma's parents challenge include, but may not be limited to, the IEP's lack of an appropriate transition plan and services, the services, the placement, the goals and benchmarks, the peer groupings, and descriptions of Uma's skills and progress.

46.     Other than this single reference to the "peer groupings," the Parents did not factually dispute the appropriateness of the peers in the Life Skills Program in the request for Hearing.

47.     Only after the Hearing request was filed, Dr. Tubbs conducted an observation of the Life Skills Program on January 28, 2021 and then submitted a Report of Program Observation on February 26, 2021, less than two weeks before the Hearing.

48.     The report detailed Dr. Tubbs's observation and opinion on the appropriateness of the Life Skills Program for Uma, focusing on the peers in the program. (Decision at 25, ¶57).

49.     This is the first time, after the unilateral placement was made, that the Parents' expert provided any information to the District about the Life Skills Program.

50.     The Hearing was scheduled for March 8, 12, and 15, 2021.

51.     The Parents presented their case on March 8 and 12, 2021 and rested after calling two witnesses, Uma's mother and Dr. Tubbs.

52.     The District presented its case on March 12 and 15, 2021.

53.     Five members of Uma's special education team testified on behalf of the District. Katherine Gately, the Special Education Team Facilitator at Amesbury Middle School; Robin Ratigan, Occupational Therapist; Cathryn Mamakos, Special Education Teacher; Shannon Kennedy Blanchett, Speech and Language Pathologist; and Dr. Lynn Catarius, Director of Student Services.

54.     Ms. Gately has been facilitating Uma's team meetings, and working with Uma's team, including drafting Uma's IEPs, since 6th grade. She is the facilitator for every student on an IEP at the middle school, including the students in the Life Skills Program. (Transcript Vol. 2, p. 272).

55.     Ms. Ratigan is the Occupational Therapist and provided direct services to Uma in 5th grade, 6th grade, and 7th grade at least two times per week. She worked with Uma directly in various educational settings, including her inclusion classes, specials, and small group academic

classes. She attended team meetings, drafted IEP goals and benchmarks, evaluated Uma, and provided consultative services to her team in 5th grade, 6th grade, and 7th grade. Ms. Ratigan consults to the Life Skills Program and services all of the students in the program. (Transcript Vol. 3, p. 42-43, 48).

56.     Ms. Mamakos was Uma's special education teacher in 5th and 6th grade. She taught Uma in the ESY program in 2019 and walked Uma out of the building at the end of every school day during 6th and 7th grade. She attended team meetings, drafted IEP goals and benchmarks, and evaluated Uma as well. Ms. Mamakos observed Uma at MHA. She is the current teacher in the Life Skills Program. (Transcript Vol. 3, p. 77-79).

57.     Ms. Kennedy Blanchett, Speech and Language Pathologist, provided direct services to Uma in 5th grade, 6th grade, and 7th grade. She worked with Uma directly in various educational settings, including her inclusion classes, specials, and small group academic classes. She attended team meetings, drafted IEP goals and benchmarks, evaluated Uma, and provided consultative services to her team in 5th grade, 6th grade, and 7th grade. Ms. Blanchette also consults to the middle school and high school Life Skills Program and services all of the students in those programs. (Transcript Vol. 3, p. 144-145).

58.     Dr. Catarius, the Director of Student Services, has been working on Uma's case since 6th grade. She has attended all of Uma's IEP team meetings, consulted with staff working with Uma, observed Uma in various settings, including multiple times in the District and multiple times at MHA, and met with and communicated with Uma's parents. (Transcript Vol. 3, p. 193).

59.     The District's witnesses testified that they have known Uma and worked with her in their respective capacities for over three years while she was at the middle school. They all

testified that the IEP in dispute was reasonably calculated to provide Uma with a free appropriate public education in the least restrictive environment and that she would have made progress had she been placed in the Life Skills Program. Further, they testified that the peers in the Life Skills Program would be appropriate peers for Uma, and that she would have appropriate peers throughout all aspects of her day: academic, vocational, and social. Additionally, she would continue to benefit from the inclusion opportunities within the District.

60.     On March 15, after the Parents rested their case but prior to the District resting its case, the Hearing Officer held a sidebar conference in which she, *sua sponte*, ordered the District to submit the redacted peer IEPs and Behavior Support Plans (hereinafter "BSPs") of the students in the Life Skills Program for her independent consideration.[3]

61.     The District objected to this request for several reasons, most notably including that the Parents had the burden to prove their case and they had closed their case without submitting the IEPs into evidence.[4]

62.      Without clear explanation, the Hearing Officer overruled the objection and ordered that the IEPs and BSPs be submitted into evidence.

63.     As a result of this order, the District re-called a witness on March 25, 2021 in which the witness painstakingly described the profile of each student, describing why they were appropriate peers for Uma.

64.     The District rested its case on March 25, 2021.

65.     The Hearing Officer issued the Decision on June 3, 2021.

---

[3] The Hearing Officer also ordered the redacted IEPs from the students at MHA.
[4] The Parents had requested and were in possession of the IEPs through discovery, yet chose not to offer them into evidence.

66.    In her Decision, the Hearing Officer found that the Parents had failed to meet their burden to prove that the services proposed by the District in its Life Skills program were inappropriate.

67.    Rather, the Hearing Officer specifically found that the services proposed by Amesbury in Uma's IEP were appropriate; that the curriculum and methodology utilized in the Life Skills Program were an appropriate fit for Uma; that Uma would benefit from many of the Life Skills Program's pre-vocational activities; and that the social skills instruction, which is integrated throughout the Life Skills Program, was appropriate to meet Uma's needs.

68.    Nonetheless, ignoring the explicit testimony of the District's witnesses that the Life Skills program would provide Uma with an appropriate peer group – and without any credible evidence to the contrary – the Hearing Officer found that placement in the Life Skills program was not reasonably calculated to provide Uma with an appropriate cohort of peers "with whom she may practice her developing skills."

69.    The Hearing Officer further found that Uma would not have had opportunities to form meaningful opportunities with peers in the Life Skills Program between November 5, 2020 through the end of the school year.

70.    The Hearing Officer formed these erroneous conclusions despite finding all the District's witnesses – who testified to the contrary – to be credible and "even accepting their testimony as true" (Decision at 35) and without receiving any credible evidence to the contrary.

71.    The Hearing Officer found that Parents are entitled to reimbursement for Uma's placement at MHA expressly and solely because Uma, a fifteen year old 8th grader, "appears to have found her place socially" and "has developed her first true friendship" at MHA, even

though there were only seven students in the entire school, four of whom were between the ages of 18 and 21 years old and were participating in post-high school studies.

72.    On the other hand, the Hearing Officer found the MHA program to be significantly limited, including the age disparity between the students; the fact that Uma spent 40 percent of her school day with one adult and without peer interaction; and the lack of the opportunity to interact with non-disabled peers.

73.    The Hearing Officer specifically found that MHA "falls short of offering Uma an education that meets all of her needs" and "may not provide Uma with a [free appropriate public education] in the [least restrictive environment]."

74.    In rendering this Decision, the Hearing Officer erroneously found that the Parents met their burden to prove that Uma was denied a free appropriate public education because she would not have "opportunities to form meaningful connections with peers" in the Life Skills Program.

75.    The only credible evidence regarding the appropriateness of the peer group was presented through the testimony of the school witnesses, all of whom the Hearing Officer found credible, and all of whom testified that the peer group was appropriate. The Hearing Officer specifically found the Parents' expert, Dr. Tubbs, not to be credible.

76.    The Hearing Officer erred by not considering the information that was available to the team at the time Uma was unilaterally placed at MHA. Specifically, because Uma did not try the Life Skills program, nor did the Parents or their expert observe the program prior to Uma's unilateral placement at MHA, the team had no information to suggest that Uma would not interact appropriately with students in the program at the time that they proposed her IEP.

77.     After finding the District's witnesses to be credible and "accept[ing] their testimony as true," the Hearing Officer ignored the weight of the evidence by failing to credit the testimony of school staff that there was an appropriate social cohort within the Life Skills program for Uma, without any evidence presented to the contrary.

78.     The evidence was overwhelming that the peer cohort in the Life Skills program was appropriate.  Specifically, credible testimony was presented that "Academically, Uma would fall in the top half to third of the class. For math, ELA, science, and social studies, she would likely be placed with three other students; a sixth grader, a seventh grader, and an eighth grader, two of whom are male and the third of whom is remote. Uma would probably be toward the lower end of that grouping academically, though she would be toward the higher end in her academic independence. . . . Socially and vocationally, Uma would also fall in the middle; she would be with students from whom she could learn and students who could learn from her about different interests."

79.     The Hearing Officer abused her discretion by inappropriately discounting the availability of one student as an appropriate peer for Uma because that student attended school remotely during the 2020-21 school year due to COVID-19 concerns. [5]

80.     While school staff testified that this student would have been appropriately grouped with Uma academically, socially and vocationally, the Hearing Officer failed to consider her as an appropriate peer because of her remote attendance. However, given the uncertainties flowing from COVID-19 protocols during the school year, Uma's team did not know, nor could they have known, the scope and length of students' remote attendance.

---

[5] The Massachusetts Department of Elementary and Secondary Education allowed students to learn remotely during the 2020-21 school year due to the COVID-19 pandemic.

81.     By basing her decision, in whole or in part, upon her finding that Uma's team was actually aware that this student – who she apparently deemed to be an appropriate peer – "would remain remote" for the 2020-21 school year, the Hearing Officer relied upon mere supposition and made an error of material fact.

82.     In fact, the student returned to in-person attendance before the end of the school year once the Department of Elementary and Secondary Education ordered school districts to have all students return to in-person learning.

83.     The Hearing Officer made an additional finding of fact that is wrong and not supported by the record when she concludes that the students who would be paired with Uma for academic instruction are not the students who are appropriate social matches. Ms. Mamakos testified that two of the three students paired with Uma for academic instruction would also be appropriate social matches (and vocational matches). This is an error of material fact in the Hearing Officer's conclusion.

84.     In her Decision, the Hearing Officer abused her discretion by applying an incorrect legal standard.  Specifically, by implying that in order to receive a free appropriate public education, the District must ensure that Uma has a "true friend" in school, the Hearing Officer held the District to an inappropriately high – and impossible – standard.

85.      By basing her decision upon whether Uma was grouped with students with whom she could be a "true friend" – and by tacitly approving the MHA program because Uma "developed her first true friendship there" – the Hearing Officer abused her discretion by imposing an obligation on the District far beyond that which is legally required and which ignores the District's obligation to simply educate a student in the least restrictive environment including, to the extent possible, alongside non-disabled peers. In short, while the District has the

obligation to place the student in a setting with appropriate peers, it does not fail in its obligation
if a friendship does not develop from that placement.

86.     The Hearing Officer wrongly shifted the burden of proof to the District in
her conclusion, stating that school staff "testified to the social skills instruction delivered within
the Life Skills Program, but the District offered no testimony about spontaneous social
interactions among Life Skills students that could have engaged Uma in this way."

87.     It is not the District's burden to prove this; instead, the burden lies with the
Parents, and they presented no information that spontaneous social interactions do not occur in
the Life Skills Program.

88.     The Hearing Officer erred by ordering reimbursement for Uma's placement at
MHA even though she found that it "falls short of offering Uma an education that meets all of
her needs" and "may not provide Uma with a FAPE in the LRE."

89.     The Hearing Officer's Decision ignores the fact that, at the time that the Amesbury
team proposed an IEP for Uma in May 2020, it would have been in violation of federal and state
regulations had they proposed a placement at MHA knowing, as the Hearing Officer found, that
its program did not meet all of her needs and that it failed to provide her with a free appropriate
public education in the least restrictive environment.

90.     In finding that what MHA provided to Uma "meets the reimbursement standard for
a unilateral placement," the Hearing Officer failed to describe how "the nexus between the
special education required and the special education provided is satisfied."

91.     The Hearing Officer abused her discretion by failing to give weight to her own
findings about significant concerns with the MHA program, including the disparity in ages
among the MHA students; the fact that Uma spent 40 percent of her school day with one adult

and no access to peers; and the absence of any interaction whatsoever with non-disabled peers, which the Hearing Officer found is meaningful and beneficial to Uma.

92.    The Hearing Officer abused her discretion and demonstrated bias by, in her final footnote, stating "I encourage MHA to incorporate programming allowing Uma to receive more of her academic instruction with her peers, and providing her, through post-COVID-19 pre-vocational activities, with additional opportunities to interact with neurotypical peers and others."

93.   On the other hand, the Hearing Officer failed to offer Amesbury - which provided the educational program that she deemed to be appropriate in all ways other than the absence of a peer group to form friendships during COVID restrictions - with advice as to how to modify its program to allow for Uma's return to the District.

## COUNT ONE
### Individuals with Disabilities Education Act,
### 20 U.S.C. §1415(i) and M.G.L. ch. 71B, §3

94.    The Plaintiff realleges and incorporates herein by reference the allegations contained in Paragraphs 1 through 93 of its Complaint.

95.    The Hearing Officer's Decision contains errors of law and fact, is unsupported by a preponderance of the evidence and is incorrect as a matter of law.

96.    The Hearing Officer's Decision is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

97.    The Hearing Officer's Decision violates the Plaintiff's rights to due process of law.

98.    The Hearing Officer's Decision ignores or misapplies relevant precedent, including, inter alia, the decisions of the United States Supreme Court in *Endrew F. v. Douglas*

*County School District RE-1*, 137 S. Ct. 988 (2017) and *Florence County School District Four v. Carter*, 510 U.S. 7 (1993).

99.     Without limiting the generality of the foregoing, the Plaintiff objects, inter alia, to the following portions of the Hearing Officer's Decision:

      a.  The portion of the Decision that holds that Amesbury's May 21, 2020 to May 20, 2021 IEP is not reasonably calculated to provide Uma with a free appropriate public education in the least restrictive environment.

      b.  The portion of the Decision that holds that MHA meets the reimbursement standard for unilateral placement.

WHEREFORE, the Plaintiff requests that the Court:

A.      Receive the records of the administrative proceeding and hear additional evidence as appropriate;

B.      Reverse all portions of the Hearing Officer's Decision and deny all relief awarded to Defendant Parents;

C.      Issue an order finding that Amesbury provided Uma with a free appropriate public education in the least restrictive environment for the period of May 21, 2020 to May 20, 2021; and

D.      Grant such other and further relief as the Court deems just.

Respectfully submitted,

AMESBURY PUBLIC SCHOOLS,
By its attorneys,


*Jeffrey M. Sankey*

Jeffrey M. Sankey, BBO #551062
Katie A. Meinelt, BBO #678903
SANKEY, MEINELT & FISHER, LLP
25 Braintree Hill Park, Suite 200
Braintree, MA 02184
(781) 930-3127
jsankey@sankeylaw.com
kmeinelt@ sankeylaw.com